1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

ROBERT McADAM,

                                    Plaintiff,

        v.

STATE NATIONAL INSURANCE
COMPANY, INC. and DOES 1
through 25, inclusive,

                                    Defendants.

Case No. 12-cv-1333-BTM-MDD

**ORDER DENYING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

        Defendant State National Insurance Company, Inc. ("State National")
seeks summary judgment as to all claims.  The Court held a summary
judgment hearing on May 20, 2014.  For the reasons set forth herein, as well
as those stated at the hearing, the Court **DENIES** the motion**.**

## I. <u>BACKGROUND</u>

        This case arises from a "Hull and Machinery/Protection and Indemnity"
insurance policy issued by State National to Plaintiff Robert McAdam
("Plaintiff" or "McAdam") for the term May 5, 2011 to May 5, 2012 (No.
TUV221275-00).  The policy was issued on May 9, 2011, and was
subsequently amended via endorsements.  (Def.'s Ex. 12.)  As of

September 22, 2011 the policy insured, *inter alia*, two vessels: *Jessica M* and *Shirley B*.  (Def.'s Ex. 12 at SNIC 0032 (Endorsement no. 5.)) It did not cover operations south of the California/Mexico border until endorsement no. 14 became effective on December 21, 2011.  (Def.'s Ex. 12 at SNIC 0040.)

Robert McAdam does not own the vessels, as alleged in the Complaint. (Compl. ¶9.)  Rather, he is the managing member of McAdam's Fish LLC. (McAdam Decl. ¶5.)  For purposes of limiting liability, McAdam's Fish owns its vessels through eight wholly owned subsidiaries, each of which owns a fishing vessel.  (Opp'n 1.)  The *Jessica M* is owned by subsidiary Charca Fish III LLC and the *Shirley B* is owned by subsidiary Charca Fish IV LLC. (McAdam Decl. ¶7.)

McAdam's Fish bought the vessels in 2011, when they were shrimp trawlers.  They were then stripped and converted into tuna boats at an Alabama shipyard.  (McAdam Decl. ¶10-13; Def.'s Ex. 13 at 88:15-22.)  In September or October 2011, Plaintiff contacted insurance broker Sharon Edmondson seeking coverage for the *Shirley B* and *Jessica M* (originally named the *Alyona M* and the *Svetlana M*).  (Decl. of Sharon Edmondson ("Edmondson Decl.") ¶12.)  Endorsement no. 5 to the policy, effective September 22, 2011, provided $460,000 and $474,000 in hull and machinery coverage, respectively, with a $10,000 deductible.  (Def.'s Ex. 12 a SNIC 0032.)  Master Marine, Inc. completed conversions on the boats in mid December 2011.  (McAdam Decl. ¶13.)  On December 21, 2011, the hull coverage for each vessel was increased to $800,000 by endorsement nos. 8 and 9, which also provide $500,000 in protection and indemnity coverage, and coverage for a crew of five salaried at $425 per month for five months.  (Def.'s Ex. 12 at SNIC 0035-36.)   After they underwent stability tests, McAdam sent the vessels to the South Pacific to fish.  (McAdam Decl. ¶14.)

On February 24, 2012, the *Shirley B's* rudder snapped off while the vessel was fishing near New Zealand.  The *Jessica M* traveled some seventy miles to provide assistance, and towed the *Shirley B* to port in Tauranga, New Zealand.  State National or its agent directed the *Shirley B* to a repair yard, and both ships were repaired in New Zealand.  While towing the *Shirley B*, the crew of the *Jessica M* allegedly reported that her steering became "loose" and "sloppy."  (Def.'s Ex. 68, SNIC 0153-54.)  Plaintiff sought reimbursement for repairs under the policy.  State National retained Optimum Claims Services, Inc. ("Optimum") for claims adjustment purposes and hired marine surveyor Arnold & Arnold ("A&A") to inspect the vessels.  (State National is a "program" underwriting firm that does not do claims adjustment itself.)  Of the approximately $163,000 claimed for repairs to the *Shirley B*, State National paid $126,875.07.  The claim concerning the *Jessica M* was denied in May 2012.

On June 4, 2012, Plaintiff filed this lawsuit, asserting the following causes of action: (1) breach of insurance contract; (2) breach of the implied covenant of good faith and fair dealing; (3) injunctive relief and restitution pursuant to Cal. Bus. & Prof. Code §§ 17200, *et seq.*; and (4) declaratory relief.  The Court dismissed the third cause of action.  (Doc. 9.)  State National now seeks judgment as to each remaining claim.

## II.  <u>LEGAL STANDARD</u>

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  A fact is material when, under the governing substantive law, it could affect the outcome of the case.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Arpin</u>

v. Santa Clara Valley Transp. Agency, 261 F.3d 912, 919 (9th Cir. 2001).  A
dispute is genuine if a reasonable jury could return a verdict for the
nonmoving party.  Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of
establishing the absence of a genuine issue of material fact.  Celotex, 477
U.S. at 323.  The moving party can satisfy this burden in two ways: (1) by
presenting evidence that negates an essential element of the nonmoving
party's case; or (2) by demonstrating that the nonmoving party failed to
establish an essential element of the nonmoving party's case on which the
nonmoving party bears the burden of proving at trial.  Id. at 322-23.
"Disputes over irrelevant or unnecessary facts will not preclude a grant of
summary judgment."  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors
Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

Once the moving party establishes the absence of genuine issues of
material fact, the burden shifts to the nonmoving party to set forth facts
showing that a genuine issue of disputed fact remains.  Celotex, 477 U.S. at
314; In re Oracle Corp. Sec. Litig., 627 F.3d 376, 387 (9th Cir. 2010).  The
nonmoving party cannot oppose a properly supported summary judgment
motion by "rest[ing] on mere allegations or denials of his pleadings."
Anderson, 477 U.S. at 256.  When ruling on a summary judgment motion,
the court must view all inferences drawn from the underlying facts in the light
most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v.
Zenith Radio Corp., 475 U.S. 574, 587 (1986).


### III.  APPLICABLE LAW

A marine insurance contract is interpreted in accordance with the law
of the state in which it was formed unless there is a controlling federal rule
on point, or unless there is a reason to create a federal rule.  Wilburn Boat

1  Co. v. Fireman's Fund Insur. Co., 348 U.S. 310 (1955); Ingersoll-Rand Fin.

2  Corp. v. Employers Ins. of Wausau, 771 F.2d 910 (5th Cir. 1985).  See also

3  Ghotra v. Bandila Shipping, Inc., 113 F.3d 1050, 1054 (9th Cir. 1997).

4  Following this rule, except where there is an "entrenched federal precedent,"

5  state substantive insurance law governs marine insurance disputes.  See,

6  e.g., Certain Underwriters at Lloyds, London v. Inlet Fisheries, Inc., 518 F.3d

7  645 (9th Cir. 2008).  Here, absent an established federal rule or need to

8  create one, California law applies.  See generally Cal. Ins. Code Part 1 (Fire

9  and Marine Ins.); Abbey Co., LLC v. Lexington Ins. Co., 289 Fed. Appx. 161,

10 163-164 (9th Cir. 2008) ("Insurance policies are contracts, and "[t]he words

11 of a contract are to be understood in their ordinary and popular sense."

12 (quoting Cal. Civ. Code § 1644.)); Bennett v. State Farm Mutual Auto. Ins.

13 Co., 731 F.3d 584 (6th Cir. 2013).

14

15 ## IV. DISCUSSION

16     A breach of contract claim under California law requires the plaintiff to

17 establish four elements: (1) the existence of a contract; (2) plaintiff's

18 performance or excuse for nonperformance of the contract; (3) defendant's

19 breach of the contract; and (4) damages resulting from defendant's breach

20 of the contract.  Trovk v. Farmers Group, Inc., 171 Cal.App. 4th 1305, 1352

21 (2009).  State National raises several challenges to Plaintiff's breach of

22 contract claim, as well as his tortious bad faith claim.

23 **A.    Plaintiff's Standing as the Insured**

24     An insurance policy is valid only if the insured has an insurable interest

25 at the time the policy issues.[1]  See Cal. Ins. Code § 280; Paul Revere Life

26

27     [1] The value of the interest at the time of loss may limit recovery, as
insurance contracts provide indemnity, not profit.  Davis v. Phoenix Ins. Co.,
28 111 Cal. 409 (1896).  See also Cal. Ins. Code § 389.  The measure is "the
extent to which the insured might be damnified by loss or injury thereof."  Cal.

Ins. Co. v. Fima, 105 F.3d 490, 491 (9th Cir. 1997).  "Insurable interest is a keystone of the concept of insurance, safeguarding the insurer against the risk that arises if one who will receive the monetary benefit from loss of the insured property (or life, as it may be) has no interest in the property not being destroyed."  Woods v. Independent Fire Ins. Co., 749 F.2d 1493, 1496 (11th Cir. 1985).  "California law does not require that insureds themselves own traditional forms of property interests to create an insurable interest in property." Abbey Co., LLC v. Lexington Ins. Co., 289 Fed. Appx. 161, 163 (9th Cir. 2008).  Rather, "[e]very interest in property, or any relation thereto, or liability in respect thereof, of such a nature that a contemplated peril might directly damnify the insured, is an insurable interest." Cal. Ins. Code § 281.  See also Hooper v. Robinson, 98 U.S. 528, 538 (1878) ("The agent, factor, bailee, trustee, consignee, mortgagee, and every other lien-holder, may insure to the extent of his own interest in that to which such interest relates."); Shade Foods, Inc. v. Innovative Prods. Sales & Marketing, Inc., 78 Cal. App. 4th 847, 875 (2000); Jam Inc. v. Nautilus Ins. Co., 128 S.W.3d 879 (Mo. Ct. App. 2004).  Whether an insurable interest existed is a question of fact.  See Am. Gen. Life Ins. Co. v. Germaine Tomlinson Ins. Trust, 2010 U.S. Dist. LEXIS 103730, *14-15 (S.D. Ind. 2010).

State National argues that McAdam lacks standing to sue as the insured person because he is not the owner of the vessels.  In response,

---

Ins. Code § 284.  When the name of the person intended to be insured is specified in a policy, it can be applied only to his own interest.  Id. § 287.  Where the description of the insured is so general that it may comprehend any class of persons, the claimant must show it was intended to include him.  Id. § 390.  Where the language is uncertain as to the persons protected, it is interpreted "in its most inclusive sense, for the benefit of the insured."  Safeco Ins. Co. of America v. Hartford Fire Ins. Co., 238 Cal. App. 2d 77, 79 (1965).  "In a case of partial loss, a marine insurer is liable only for such proportion of the amount insured by him as the loss bears to the value of the whole interest of the insured in the subject matter."  Cal. Ins. Code § 1988.  See also Hilton v. Federal Ins. Co.  118 Cal. App. 495 (1931).

McAdam argues that his interest in them has been, at all relevant times, insurable.  McAdam is the largest individual investor in McAdam's Fish LLC, with a 22% share (initial capital investment of $1.67M).  (McAdam Decl. ¶6.) Operating the company is his full-time job and his salary is his primary source of income.  (Id. ¶¶6, 8.)  He also has outstanding loans to the company.  (Id. ¶8, 26.)  On the insurance application, McAdam is written-in as "manager" and the relevant subsidiary is named as the owner.  (See Def.'s Exs. 9 & 10; Edmondson Decl. ¶¶12-14.)  See generally Cal. Ins. Code § 388 ("When an insurance contract is executed with an agent or trustee as the insured, the fact that his principal or beneficiary is the real party in interest may be indicated by describing the insured as agent or trustee, or by other general words in the policy.").  An email exchange between the insurance broker and State National's exclusive underwriter, indicates that State National was on notice of the ownership structure, at least as of December 19, 2011.  (Edmondson Decl. ¶16; Pl.'s Ex. F.) Additionally, the policy accommodates situations where the "assured" is not the only owner via an "affiliated companies clause."  (See Def's Ex. 12 at 4 of 14 (SNIC 015).)  Moreover, the policy provision for claims brought by someone other than the owner would be a nullity if such claims were precluded.  (Def.'s Ex. 12 3:4-5 ("If a claim is made under the Policy by anyone other than the Owner of the vessel, such person shall not be entitled to recover to a greater extent than would the Owner, had claim been made by the Owner as an Assured named in this Policy.").)

In light of this evidence, the Court finds that State National has failed to meet its burden as to the issue of whether Plaintiff had an insurable

/ /

/ /

1  interest in the vessels.[2]  See Tri-State Mut. Grain Dealers Fire Ins. Co. v.

2  Morris, 268 F.2d 956 (9th Cir. 1959) (under California law, the insured had

3  an insurable interest in a restaurant that burned down even though the sale

4  had not yet closed); Gillis v. Sun Ins. Office LTD, 238 Cal. App. 2d 408, 413

5  (1st Dist. 1965) (affirming finding that a defunct corporation named as the

6  insured held an insurable interest where "[the insurer] intended to insure the

7  property in question; there was no fraud or misrepresentation on the part of

8  the insured; there was no increase of hazard on the part of the insurance

9  company on account of the error in the name of the insured or because of

10  the merger; the management remained the same; and the insurer accepted

11  and retained the premium payments"); Seamen v. Enterprise Fire & Marine

12  Ins. Co., 18 Fed. 250 (C.C.E.D.Mo. 1883) (finding a shareholder owning

13  three-sixteenths of company that owned a steamboat to have an insurable

14  interest in the vessel).[3]

15  **B.    Exclusions**

16           1.     The *Shirley B*

17           An exclusion for betterment or improvements is standard in insurance

18  policies.  Fireman's Fund Ins. Co. v. Sneed's Shipbuilding, Inc., 803 F.

19  Supp. 2d 530, 535 (E.D. La. 2011).  State National contends that it has paid

20  the full amount owed on the claim for repairs to the *Shirley B* because any

21  excess amount constituted charges for "betterment" not covered by the

22

23
    _____

24  [2] In light of this conclusion, the Court need not address Plaintiff's argument that State National has conceded, forfeited, or waived its right to challenge Plaintiff's standing.  (Opp'n (Doc. 80) at 13.)  Nor does the Court

25  need to rely on admissions applicable to the motion *sub judice* by Rule 36(a) and the May 20, 2014 Order (Doc. 105).

26
    [3] The result on this point is the same whether the Court applies California

27  law or admiralty law.  See ABB Power T&D Co. v. Gothawe Versicherungsbank VVAG, 939 F. Supp. 1568, 1580 (S.D. Fla. 1996) ("[U]nder federal admiralty

28  law, 'insurable interest' is easily understood to mean 'any pecuniary interest.'").

1  policy.  (See Hillger Decl. ¶¶15-16; Def.'s Ex. 76.)  Plaintiff disputes this with

2  the opinion of the surveyor he hired, Steve Mabbett.  According to

3  Mr. Mabbett, the repairs were necessary to make the ship fit for its intended

4  purpose.  (Def.'s Ex. 81.)  On this record, the extent to which repairs to the

5  *Shirley B* constituted betterment not covered by the policy is a genuinely

6  disputed issue of material fact.

7      2.   The *Jessica M*

8      Relying upon the so-called "Inchmaree clause," State National argues

9  that the policy does not cover the repairs to the *Jessica M*.[4]  "An Inchmaree

10  clause significantly expands the hull insurer's undertaking by specifying

11  coverage for a variety of perils in addition to the 'adventures and perils' of

12  the sea specified in the ancient language of the standard form policy."

13  Thanh Long Partnership v. Highlands Ins. Co., 32 F.3d 189, 191 (5th Cir. La.

14  1994).  The clause *sub judice* provides, in pertinent part:

16        ADDITIONAL PERILS (INCHMAREE)
      Subject to the conditions of this Policy, this insurance

17        also covers loss of or damage to the Vessel directly
      caused by the following: . . .

18        Breakdown of motor generators or other electrical

19        machinery and electrical connections thereto, bursting of
      boilers, breakage of shafts, or any latent defect in the

20        machinery or hull, (excluding the cost and expense of
      replacing or repairing the defective part); . . .

21        Negligence of Charterers and/or Repairers, provided such
      Charterers and/or Repairers are not an Assured hereunder;

22        Negligence of Masters, Officers, Crew or Pilots;

23        Provided such loss or damage has not resulted from want

24  —————————————

25      [4] This type of clause became a staple of marine insurance contracts after the House of Lords, in an 1887 decision applying the *ejusdem generis* rule of construction, held that the bursting of a boiler on the steamship *Inchmaree* was

26  not a covered peril.  Federal law applies to its interpretation to the extent the clause is consistent with those involved in federal maritime precedent.  See

27  generally 5801 Assocs., Ltd. v. Continental Ins. Co., 983 F.2d 662, 666 (5th Cir. 1993) ("entrenched federal precedent exists on the interpretation of the

28  Inchmaree clause").

12-cv-1333 BTM-MDD

1
2

of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them. . . .

(Def.'s Ex. 12, p. SNIC 000005.)

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

State National argues that, under this clause, the policy does not cover repairs to remedy ordinary wear and tear, latent defects, or damage that has not yet occurred.  (Mot. at 19.)  That may be so with respect to the "cost and expense of replacing or repairing the defective part" itself.  Yet that argument fails because State National has not shown that the repairs to the *Jessica M* are not covered by the "Negligence of Charterers and/or Repairers" subsection.  (<u>See</u> Def.'s Ex. 81 (Plaintiff's surveyor opining that the failure to replace the rudder's top  bearing during the *Jessica M's* conversion constituted negligence on the part of the Alabama shipyard).)  "Repairers" is undefined, but could be read to include workers performing the inadequate welds[5] that prompted the later repairs to the *Jessica M*.  <u>See generally</u> <u>Exxon Corp. v. St. Paul Fire & Marine Ins. Co.</u>, 129 F.3d 781 (5th Cir. 1997) (ambiguities in a marine insurance contract drafted by the insurer are interpreted in favor of coverage).  Since this subsection contains no exclusion for the defective part itself, as, e.g., the breakage and latent defects sections do, the contract could be interpreted to include the repairs to the rudder assembly.

20
21
22

State National suggests that the inadequate welds to the rudder assembly must be interpreted as latent defects under the Inchmaree clause.

23

//

24
25
26
27
28

---

[5] The record indicates that the *Jessica M's* steering problems were caused, in part, by inadequate welds to the sole piece.  (<u>See, e.g.</u>, Def.'s Ex. 21; Hillger Decl. ¶14.)  Each party's surveyor opined that failure to replace the rudder stock bearings was also a contributing factor.  (<u>See</u> Hillger Decl. ¶12; Mabbett Decl. ¶7; Def's Ex. 81 at 3 (Plaintiff's surveyor opining that "[t]he bearing was in such a condition that it would have been evident that it needed to be replaced."); Def.'s Ex. 68 at SN00155 (Doc. 57-9) at 131 (A&A report.)

The clause does exclude repairs to (or replacement of) the defective part itself.  See, e.g., Ferrante v. Detroit Fire & Marine Ins. Co., 125 F. Supp. 621, 624-26 (S.D. Cal. 1954) (concluding that, with respect to a latent defect, the Inchmaree clause precludes coverage for the defective part itself, as opposed to damage caused by the failure of the part); Mellon v. Federal Ins. Co. 14 F.2d 997, 1003 (S.D.N.Y. 1926) ("To hold that the clause covers it would be to make the underwriters not insurers, but guarantors, and to turn the clause into a warranty that the hull and machinery are free from latent defects, and, consequently, to make all such defects repairable at the expense of underwriters.").  But State National cites no provision establishing that the welds were latent defects rather than negligent repairs, or that those categories are mutually exclusive.  Thus, even assuming that ordinary wear and tear contributed to the steering problems, and that the inadequate welds did not cause any damage to other "parts" or "machinery," the Court cannot find that the Inchmaree clause precludes coverage for the Jessica M's repairs.

## C.    Breach of Warranties

"A warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself." United States ex rel. R Excavating v. PK Contrs., 1997 U.S. App. LEXIS 34870, 6-7 (9th Cir. 1997).  The Court strictly construes maritime express warranties.  Lexington Ins. Co. v. Cooke's Seafood, 835 F.2d 1364, 1366 (11th Cir. 1988).  The effect of a breach of warranty in a marine insurance policy is governed by state law.  Wilburn Boat Co., 348 U.S. at 317; Suydam v. Reed Stenhouse of Washington, Inc., 820 F.2d 1506, 1508 (9th Cir. 1987) (referring to state law to resolve the consequences of a breach of an express warranty in a marine insurance policy); N.H. Ins. Co. v.

Home Sav. & Loan Co. of Youngstown, Ohio, 581 F.3d 420, 426 (6th Cir. 2009).  Depending on the materiality of the warranty and the nature of the breach, a failure to strictly comply with the terms of an express warranty may discharge the insurer from liability.  See Cal. Ins. Code §§ 446-449.  See also Palmquist v. Standard Acc. Ins. Co., 3 F.Supp. 356 (S.D.Cal.1933); Yu v. Albany Ins. Co., 281 F.3d 803, 809 (9th Cir. 2002); Commercial Union Ins. Co. v. Pesante, 359 F.Supp.2d 81, 82–83 (D.R.I. 2005), rev'd on other grounds by 459 F.3d 34 (1st Cir. 2006) (finding no entrenched admiralty rule that a "failure to literally comply with an express warranty in a marine insurance contract voids the contract even if the breach is not material to the loss").   State National argues that its duty to provide coverage was suspended because Plaintiff violated (1) the stability warranty, (2) the warranty of seaworthiness, and (3) the survey warranty.

    1. The Stability Warranty

    The policy states:

> 30. STABILITY WARRANTY (H&P) (HP-109)
> It is warranted by the Assured that any additions, installations, and/or structural changes to any vessel(s) insured, which would affect the stability of the vessel(s) will be reported to the Company before the vessel(s) proceeds to sea. It is further warranted by the Assured that the insured Vessel(s) will not proceed to sea until the stability of the insured vessel(s) has been examined and approved by a qualified marine surveyor. Any violations of this warranty shall void coverage under this policy from the time of such violation, notwithstanding anything contained to the contrary herein.

(Def.'s Ex. 12 at SNIC0020.)

    State National argues that McAdam breached the stability warranty by sending the newly converted vessels to the South Pacific even though they were only allowed to travel to California following stability tests in December 2011.  (Mot. at 23.)  McAdam contends that he complied with the warranty by having stability tests conducted by Sterling Marine LLC after the

conversion.  (Decl. of Travis Carter ¶¶1-2.)   State National relies upon two

December 22, 2014 letters from Travis Carter, principal of Sterling Marine

LLC, each stating that "The stability booklets are still be [*sic*] prepared based

on the resultant calculations.  The vessels [*sic*] stability is satisfactory for the

owner to transit from the shipyard in Alabama to its home port in California."

(Def.'s Exs. 20 (*Shirley B*), 21 (*Jessica M*).)  Mr. Carter explains that the

letter was intended to confirm that the vessels could safely leave the

shipyard pending the final analysis of data from the stability tests, not to

restrict the range of their travel.  (Travis Decl. ¶9.)  The Court therefore finds

that whether either stability warranty was breached is a triable issue.

> 2. <u>The Warranty of Seaworthiness</u>

> The policy provides:

> 29. SEAWORTHINESS WARRANTY (HP-106)

> > Assured warrants that at the inception of this policy the vessel(s) insured hereunder shall be in a seaworthy condition and, thereafter, during the currency of this policy, the Assured warrants that he will exercise due diligence to keep the vessel(s) seaworthy, and in all respects fit, tight and properly manned, equipped and supplied. The Assured further warrants that the Assured and/or the Assured's Master will not knowingly permit the vessel(s) insured hereunder to proceed to seas in an unseaworthy condition. Any violation of this warranty of seaworthiness shall void coverage under this policy from the time of such violation, notwithstanding anything contained to the contrary herein.

(Def.'s Ex. 12 at SNIC 00020.)

> These terms require the vessel to be seaworthy at the time of the

inception of the hull policy and, with due diligence, to be kept in a seaworthy

condition.  "Seaworthy" generally means that the vessel is "reasonably fit for

its intended purpose."  <u>See, e.g.</u>, <u>Gutierrez v. Waterman S.S. Corp.</u>, 373

U.S. 206, 213 (1963); <u>Reliance Nat'l Ins. Co. v. Hanover</u>, 246 F.Supp.2d

126, 136 (D. Mass.2003).  State National again argues that McAdam knew

the *Jessica M* wasn't seaworthy when the ship sailed toward New Zealand in

late December 2011 because she was only cleared to go to California. (Def.'s Ex. 21.)  As explained *supra*, whether McAdam complied with contractual stability requirements is a triable issue.

State National also points out that, in the opinion of Plaintiff's surveyor, Steve Mabbett, the poor welds on the rudder assemblies and inadequate bracing rendered the *Jessica M* unfit for its intended purpose.  (Def.'s Ex. 81.)  Even assuming that the inadequate welds were a *latent* defect that rendered the ship unseaworthy, the warranty would be violated only where the assured *knowingly* allows a ship to sail in an unseaworthy condition. Allstate Insur. v. Heil, No. 07-097, 2007 WL 4270355, *7 (D. Haw. 2007). For instance, it would have been a breach for Plaintiff to allow the *Jessica M* to return to sea without repair *after* learning it was no longer seaworthy due to the defects.  The Court accordingly finds that State National has failed to demonstrate a breach of the warranty of seaworthiness.  See generally Hanover Fire Ins. Co. v. Holcombe, 223 F.2d 844, 846 (5th Cir. 1955) ("the burden of proving that a vessel is unseaworthy lies upon the insurance company"); Aguirre v. Citizens Cas. Co., 441 F.2d 141, 143 (5th Cir. 1971) ("Determining the seaworthiness of a vessel at a particular moment in time is the responsibility of the trier of fact.") (citation and quotation marks omitted).

### 3. The Implied Warranty of Seaworthiness

In addition to the express warranty, State National claims a violation of the "implied warranty of seaworthiness," arguing that the vessel was not seaworthy at the inception of the policy.  (See Mot. at 22 n. 9.)  (State National ostensibly assumes the inception of the policy to be December 21, 2011 the effective date of endorsement nos. 8 & 9 adopting the new hull values for the vessels, and not September 22, 2011, when endorsement no. 5 added the vessels to the policy.)  According to the Fifth Circuit, in the

1  United States, an implied warranty of seaworthiness applies to time hull
2  policies such that, absent any contrary terms, the insurer's duty to perform
3  may be discharged if the vessel was not seaworthy at the inception of the
4  policy, regardless of whether the insured was aware of that fact.  See
5  Employers Ins. v. Occidental Petroleum Corp., 978 F.2d 1422, 1439 (5th Cir.
6  1992).[6]  Under Occidental Petroleum, the absolute warranty applies "at least
7  where the ship is in a port of repair at the time the policy attaches" and the
8  unseaworthy condition was the sole cause of the loss.  Id. at 1436, 1437.  It
9  applies to the extent it is not inconsistent with the express terms of the
10 policy.  Indeed, the Court in that case held that a clause covering, in
11 essence, "the negligence of any person other than the insured, the owner, or
12 the manager of the vessel. . . . waives or displaces the absolute warranty of
13 seaworthiness implied at the inception of a time policy."  Id. at 1440.

14      The question is whether any clauses of the policy "effectively supplant
15 or waive the absolute implied warranty of seaworthiness at the inception of a
16 time hull policy."  Id. at 1438.  In answering that question, the Court looks to
17 "the language of the provision to see if it unambiguously covers risks which
18 would ordinarily be excluded by a breach of the implied warranty of
19 seaworthiness.  If the clause does cover such a risk, then it may be said that
20 the clause underwrites that particular type of seaworthiness."  Id. at 1439
21 (citation omitted).

22      As discussed above, whether the conditions purportedly rendering the
23 vessels unseaworthy were covered by the Inchmaree clause is a triable
24 issue.  Although the parties agree that inadequate welds contributed to the

25

26      [6] The parties have not established whether that decision is an entrenched
27 rule of maritime law, but the Court assumes it is for present purposes.

28

1  loss, the vessels sailed for two months before the loss.  Weighing the

2  evidence presented under the proper standard, the Court cannot say

3  conclusively that the ships were unseaworthy as of December 21, 2011.

4  The question of seaworthiness at the relevant time(s) hence remains a

5  triable issue on this record.  Moreover, even if the vessels were not

6  seaworthy on that date, the express warranty of seaworthiness and the

7  Inchmaree clause effect at least a partial waiver of the implied warranty of

8  seaworthiness.  See Id. at 1439.  As discussed above, the "negligent

9  repairers" provision may be construed as underwriting the negligence

10  alleged here.

11         4. The Current Survey Requirement

12         On December 29, 2011, insurance broker Sharon Edmondson sent an

13  email seeking an increase in the hull coverage for each vessel.  (Def.'s Ex.

14  22.)  Endorsement nos. 8 (*Jessica M*) and 9 (*Shirley B*) amended the

15  coverage for the vessels effective December 21, 2011.  The endorsements

16  were emailed to Ms. Edmondson in January 2012.  (Def.'s Ex. 27.) Each

17  contains the following paragraph:

18  A current condition & valuation survey is required.  The survey must
    have been completed within the last 24 months and provided by
19  1/21/2012.  Insured's written compliance with all recommendations is a
    condition of coverage provided by 1/21/2011.
20

21  (Def.'s Ex. 12 at SNIC 0035.)

22         State National argues that McAdam failed to satisfy this condition

23  because no post-upgrade surveys were conducted or provided.  McAdam

24  argues, *inter alia*, that he complied with the condition.  According to

25  McAdam, Ms. Edmondson informed him that there was no need for a new

26  survey since the last survey was less than two years old.  (Edmondson Decl.

27  ¶11, Ex. D.)  She advised him to provide proof of the upgrades instead.  (Id.;

28

1   Def.'s Ex. 4 at 239-40 (McAdam Dep.))  Indeed, surveys on each vessel
2   were conducted on August 24, 2011, and McAdam provided compliance
3   certifications dated December 13, 2011.  (Def.'s Ex. 24.)  Whether McAdam
4   was bound by this condition, and whether it was satisfied are therefore
5   triable issues.

6   **D.     Omissions & Misrepresentations**

7          1.     _Uberrimaie Fidei_

8          Marine hull insurance policies are contracts _uberrimae fidei_—i.e., they
9   are grounded in the utmost good faith.  McLanahan v. Universal Ins. Co., 26
10  U.S. 170 (1828).  Under the doctrine, an underwriter is presumed to act on
11  the belief that the insurance applicant disclosed all facts material to the risk.
12  Certain Underwriters at Lloyds v. Inlet Fisheries, Inc., 518 F.3d 645 (9th Cir.
13  2007).  If the insured misrepresents or conceals known material facts, the
14  insurer may rescind the policy _ab initio_, even if the misrepresentation was
15  unintentional.  Id.; C.N.R. Atkin v. Smith, 137 F.3d 1169 (9th Cir. 1998); N.H.
16  Ins. Co. v. C'Est Moi, Inc., 519 F.3d 937, 938 (3d Cir. 2007).  Material facts
17  are those that tend to bear upon an insurer's decision to accept the risk, the
18  premium, or the terms under which the risk is insured.  Gulfstream Cargo
19  Ltd. v. Reliance Ins. Co., 409 F.2d 974 (5th Cir. 1969).  See also Cal. Insur.
20  Code §§ 331, 359; Miller v. Republic Nat'l Life Ins. Co., 789 F.2d 1336, 1340
21  (9th Cir. 1986); Mitchell v. United Nat'l Ins. Co., 127 Cal. App. 4th 457, 469
22  (2005) ("[California courts] have applied Insurance Code sections 331 and
23  359 to permit rescission of an insurance policy based on an insured's
24  negligent or inadvertent failure to disclose a material fact in the application
25  for insurance."); Mao Xiong v. Lincoln Nat'l Life Ins. Co., 2009 U.S. Dist.
26  LEXIS 45280, 13-14 (E.D. Cal. May 28, 2009).

27         According to State National, when seeking endorsement nos. 8 and 9,

28

1   McAdam failed to state that (a) the vessels were only allowed to travel to

2   California, (b) they were owned by the Charca subsidiaries, and (c) the

3   propellers were not optimal and would need to be replaced.  (Mot. at 23.)  As

4   discussed above, the Court finds that the first two issues are triable.  With

5   respect to the propellers, State National relies on an email where John

6   Eckart of HS Marine Props, who evaluated the propellers at the time of

7   conversion, opined that "this will be much less than an optimal prop, but

8   should be something workable to run until they get better props."  (Def.'s Ex.

9   17.)  McAdam contends that the email exchange with Eckart referred to

10   efficiency, not safety or seaworthiness, and was therefore immaterial.  As

11   State National has not demonstrated that any nondisclosure here was

12   material, the Court cannot grant summary judgment under the *uberrimaie*

13   *fidei* doctrine.

14          2.     The Misrepresentation Clause

15          The policy states:

16          31. MISREPRESENTATION (H&P) (HP-110) If the Assured has
            concealed or misrepresented any material fact or circumstance
17          concerning this insurance or the subject matter thereof, or in case of
            any fraud, attempted fraud, or false swearing by the Assured, touching
18          any matter related to this insurance or to the subject thereof, whether
            before or after a loss, coverage under this policy will be forfeited which
19          otherwise was granted.

20   (Exhibit 12, p. SNIC 0020.)

21          State National next argues that this clause was violated by a failure to

22   disclose "the stability letters informing McAdam that the Vessels could only

23   go to California and the email related to the design of the propellers.

24   [Exhibits 17, 20, and 21]."  (Mot. at 24.)  State National relies upon the broad

25   opinions of claims adjusters for the proposition that this information was

26   material to the claims investigation.  (Didier Decl. ¶26; Soares Decl. ¶7.)

27   "The materiality of a misrepresentation is generally a question of fact unless

28   the misrepresentation was so obviously unimportant that the trier of fact

1  could not reasonably conclude that a reasonable person would have been

2  influenced by it." <u>Chapman v. Skype, Inc.</u>, 220 Cal. App. 4th 217, 229

3  (2013).  As noted by the Court above, the stability and propeller statements

4  can be viewed as not affecting seaworthiness.  They would not then be

5  material.

6     State National also points to an email of the insurance broker referring

7  to the owner as "Robert McAdam d/b/a Charca Fish." (Reply at 7.)  While

8  that statement was false, the record indicates that the error was rectified,

9  since the endorsements concerning the vessels at issue do not contain the

10 "d/b/a" language.  (<u>See</u> Def.'s Exs. 9, 10; Edmondson Decl. ¶¶12-14.)

11 Furthermore, as with the purported nondisclosure discussed above, the

12 materiality of the misrepresentation is an issue for the jury.

13 **E.    Plaintiff's Bad Faith Claim**

14    When an insurer unreasonably and in bad faith withholds payment of a

15 claim in violation of the policy it is subject to tort liability for its breach of the

16 covenant of good faith and fair dealing.  <u>Gruenberg v. Aetna Ins. Co.</u>, 9 Cal.

17 3d 566, 575 (1973); <u>Neal v. Farmers Ins. Exchange</u>, 21 Cal. 3d 910, 921

18 (1978).  McAdam contends, *inter alia*, that State National's post-claim

19 conduct, delay, and application of exclusions have been in bad faith and

20 constitute breaches of the covenant of good faith and fair dealing.[7]  For

21 example, citing standards set forth in California's Fair Claims Settlement

22

---

23    [7] At the May 20, 2014 hearing, State National argued, for the first time,
   that <u>Moradi-Shalal v. Fireman's Fund</u>, 46 Cal. 3d 287 (1988) forecloses
24 Plaintiff's bad faith claim.  In <u>Moradi-Shalal</u>, the California Supreme Court held
   that Cal. Ins. Code § 790.03 provides no private right of action for damages
25 resulting from unfair insurer practices.  It also held, however, that common law
   causes of action, including breach of the covenant of good faith and fair
26 dealing, remain available to those injured by insurer misconduct.  <u>See</u> <u>Zhang</u>
   <u>v. Superior Court</u>, 57 Cal. 4th 364, 382-83 (2013) ("[Unfair Competition Law]
27 claims may be based on claims handling practices, as long as they do not rest
   exclusively on [Unfair Insurance Practices Act] violations.").  <u>Id.</u>  Thus, State
28 National's reliance on <u>Moradi-Shalal</u> is misplaced.

1   regulations (10 C.C.R. § 2695.7), McAdam claims that State National failed
2   to provide a timely coverage position.  (Id. ¶96(h).)  He also claims that State
3   National's surveyor improperly ignored requests for reconsideration of the
4   issues of betterment (*Shirley B*) and the denial of the claim for the *Jessica*
5   *M*.  State National argues that it is entitled to judgment on the bad faith claim
6   because it acted in good faith in reliance on the opinions of experts.

7        Under the "genuine dispute doctrine," reasonable conduct or a good
8   faith mistake is no basis for a claim that the defendant violated the covenant
9   of good faith and fair dealing.  Chateau Chamberay Homeowners Assn. v.
10  Associated Internat. Ins. Co., 90 Cal. App. 4th 335, 348 (Cal. App. 2001).
11  But "an expert's testimony will not automatically insulate an insurer from a
12  bad faith claim based on a biased investigation."  Id. at 348-49.  There are
13  "several circumstances where a biased investigation claim should go to jury:
14  (1) the insurer was guilty of misrepresenting the nature of the investigatory
15  proceedings; (2) the insurer's employees lied during the depositions or to the
16  insured; (3) the insurer dishonestly selected its experts; (4) the insurer's
17  experts were unreasonable; and (5) the insurer failed to conduct a thorough
18  investigation."  Id. (citations omitted).  Here, Plaintiff clearly alleges, at a
19  minimum, nos. 4 and 5, pointing to Defendant's cursory dismissal of the
20  opinion of Plaintiff's surveyor, Steve Mabbitt.  Therefore, bad faith remains a
21  triable issue.  See Wilson v. 21st Century Insur. Co., 42 Cal. 4th 713, 723-24
22  (2007) ("[A]n insurer is not entitled to a judgment as a matter of law where,
23  viewing the facts in the light most favorable to the plaintiff, a jury could
24  conclude that the insurer acted unreasonably.").

25

26                              **V.  CONCLUSION**

27        For the foregoing reasons, the Court concludes that State National has
28  not shown any of Plaintiff's claims to be suitable for summary judgment.

The Court accordingly **DENIES** State National's Motion for Summary Judgment.  Plaintiff's objections (Doc. 80-11) are overruled as moot.

The trial shall begin on **September 2, 2014** at **9:30 a.m.** in Courtroom 15B.

**IT IS SO ORDERED.**

DATED: June 19, 2014

BARRY TED MOSKOWITZ
Chief Judge
United States District Court

12-cv-1333 BTM-MDD